## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE BEST BUY COMPANY, INC.<br>SECURITIES LITIGATION | ) <br> ) **CASE NO. 03-CV-6193** <br> ) <br> ) **JURY TRIAL DEMANDED** <br> ) |

## CONSOLIDATED CLASS ACTION COMPLAINT

Lead Plaintiffs Louisiana School Employee Retirement System and City of Westland Police and Fire Retirement System (the "Lead Plaintiffs" or "Plaintiffs") allege the following based upon the investigation of their counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Best Buy Co., Inc. ("Best Buy" or the "Company"), as well as regulatory filings and reports, securities analysts reports and advisories about the Company, press releases and other public statements issued by the Company, interviews with former employees of the Company and media reports about the Company, and Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of purchasers of the securities of Best Buy between January 9, 2002 to August 7, 2002, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Defendant Best Buy describes itself as "North America's No. 1 specialty retailer of consumer electronics, personal computers, entertainment software and appliances. The Company operates retail stores and commercial web sites under a variety of chains. This case

concerns Musicland Stores Corporation ("Musicland"), and its financial and operational condition.

3.      Best Buy acquired Musicland in February 2001, in a transaction purportedly valued at $680 million . At the time of the acquisition, Defendants represented that Musicland had "leading Mall positions" and that the acquisition would substantiate Best Buy's "presence as the world's preeminent technology and entertainment player". Shortly thereafter, Best Buy embarked on a plan to remerchandise and remodel Musicland's "Sam Goody" stores and broaden the chain's product offerings to include, among other things, consumer electronics, digital video disks ("DVDs") and computer software. Throughout 2001, Best Buy was purportedly remodeling and remerchandising Musicland and those efforts were allegedly producing positive results for the Company.

4.      By the start of the Class Period, however, Defendants knew that the Musicland acquisition was a failure and that the remerchandising and remodeling program was not performing according to internal expectations. As detailed herein, numerous former Best Buy employees have confirmed these facts -- Musicland's retail locations were primarily located in low-grade shopping malls that were unable to generate the traffic necessary to sell the expanded product offerings that Best Buy was remodeling the stores to carry. Furthermore, the remodeling was time consuming, often behind schedule and highly disruptive to the retail location such that a store that was being remodeled generally suffered a decline in sales. Finally, in order to jump start sales, Best Buy took the short-term step of heavily discounting prices at Musicland. Defendants knew, however, that this discounting could not continue as the low margins derived from such sales would not support the expenses of running the stores.

-2-

5.      Throughout the Class Period, Defendants issued numerous positive statements concerning Musicland and the remodeling efforts, which were materially false and misleading as they failed to disclose the true condition of Musicland and its operational difficulties, among other things. These statements served to artificially inflate the price of Best Buy common stock, thereby enabling the Company to complete a $350 million convertible debenture offering on favorable terms and enabling Best Buy insiders, including defendant Anderson, to sell their personally-held Best Buy stock to the unsuspecting market, generating proceeds of more than $35 million.

6.      Unable to conceal the demise of the Musicland acquisition any further, on August 8, 2002, Best Buy slashed its earnings guidance for the second quarter of fiscal year 2003, reducing it from a range of $0.30 to $0.32 per share to a range of $0.17 to $0.21 per share. Analysts attributed the Company's declining financial results to the Musicland division, in material part. In response to these announcements, the price of Best Buy common stock declined from $30.80 per share to $19.55 per share, a one-day decline of 36%.

7.      Then, in September 2002, Best Buy announced that it was writing down the value of Musicland on its financial statements by more than $300 million. Shortly thereafter, the Company announced that it was selling Musicland for no consideration other than that the buyer would assume Musicland's debt. Two years after acquiring Musicland for hundreds of millions of dollars and representing that the acquisition would help establish Best Buy as the preeminent electronics retailer, the Company abandoned Musicland.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act.

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).   Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District and Best Buy conducts business in this District.

11.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

12.     Lead Plaintiffs purchased the common stock of Best Buy at artificially inflated prices during the Class Period, as detailed in their respective certifications, which have been previously filed with this Court and are incorporated herein by reference, and have been damaged thereby.

13.     Defendant Best Buy is a Minnesota corporation with its principal executive offices located in Eden Prairie, Minnesota.

-4-

14.    Defendant Richard M. Schulze ("Schulze") served as Best Buy's Chairman of the Board and Chief Executive Officer. On June 30, 2002 Mr Schulze resigned from the position of Chief Executive Officer but continued to serve as the Company's Chairman.

15.    Defendant Bradbury H. Anderson ("Anderson") at all relevant times served as Best Buy's Vice Chairman of the Board. Since June 30, 2002, Mr. Anderson has served as Best Buy's Chief Executive Officer. Prior to that, Mr. Andersen served as the Company's President and Chief Operating Officer.

16.    Defendant Allen U. Lenzmeier ("Lenzmeier") at all relevant times served as a Director of the Company. Since March 2002, Mr. Lenzmeier has served as Best Buy's President and Chief Operating Officer. Prior to that Mr. Lenzmeier served as President of Best Buy Retail Stores.

17.    Defendant Darren R. Jackson ("Jackson") at all relevant times, served as Best Buy's Senior Vice President of Finance, Treasurer and Chief Financial Officer.

18.    Defendants Schulze. Anderson, Jackson and Lenzmeier are hereinafter referred to, together, as the "Individual Defendants."

19.    During the Class Period, the Individual Defendants, as senior executive officers and directors of Best Buy were privy to confidential and proprietary information concerning Best Buy, its operations, finances, financial condition, present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Best Buy, as discussed in detail below. Because of their positions with Best Buy, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at

-5-

management and board of directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

20. The Individual Defendants are liable as direct participants in, and a co-conspirator with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and directors were "controlling persons" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Best Buy's business.

21. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

22. As senior executive officers and directors and as controlling persons of a publicly-traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Best Buy's financial condition and

-6-

performance, growth, operations, financial statements, business, products, markets, management,
earnings and present and future business prospects, to correct any previously issued statements
that had become materially misleading or untrue, so that the market price of Best Buy's common
stock would be based upon truthful and accurate information. The Individual Defendants
misrepresentations and omissions during the Class Period violated these specific requirements
and obligations.

    23.    The Individual Defendants are liable as a participant in a fraudulent scheme and
course of conduct that operated as a fraud or deceit on purchasers of Best Buy common stock by
disseminating materially false and misleading statements and/or concealing material adverse
facts. The scheme (i) deceived the investing public regarding Best Buy's business, operations
and management and the intrinsic value of Best Buy common stock, (ii) permitted Best Buy to
complete the sale of $350 million of debentures, (iii) enabled certain executive officers and
directors of Best Buy to sell hundreds of thousands of shares of Best Buy common stock
generating more than $35 million in proceeds, and (iv) caused Plaintiffs and members of the
Class to purchase Best Buy common stock at artificially inflated prices.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

    24.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil
Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the
securities of Best Buy during the Class Period and who were damaged thereby. Excluded from
the Class are Defendants, the officers and directors of the Company, at all relevant times,
members of their immediate families and their legal representatives, heirs, successors or assigns
and any entity in which Defendants have or had a controlling interest.

-7-

25.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Best Buy common shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Best Buy or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

26.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

27.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

28.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)  whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Best Buy; and

(c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

-8-

29.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

30.    Defendant Best Buy describes itself as "North America's No. 1 specialty retailer of consumer electronics, personal computers, entertainment software and appliances. The Company operates retail stores and commercial web sites under the names: Best Buy (BestBuy.com), Future Shop (FutureShop.ca), Magnolia Hi-Fi (MagnoliaHi-Fi.com), Media Play (MediaPlay.com), Sam Goody (SamGoody.com) and Suncoast (Suncoast.com). The Company reaches consumers through more than 1,900 retail stores in North America, Puerto Rico and the U.S. Virgin Islands."

## The Musicland Acquisition

31.    On December 7, 2000. Best Buy issued a press release announcing the acquisition of Musicland. At the time of the announcement, Musicland operated approximately 1300 retail stores under the names Sam Goody, On Cue, Suncoast and Media Play. Defendant Schulze commented on the Musicland acquisition highlighting the purportedly strong "leading mall position" of Musicland's stores and stating in pertinent part as follows:

> "These strategic moves position Best Buy to grow profits through new customers, new channels of distribution and improved operating efficiencies. The acquisitions allow us to deliver digital entertainment technologies to consumer segments not currently served by Best Buy's store format, particularly in rural areas, malls and the early technology adopters," said Richard M. Schulze, Best

-9-

Buy Founder, Chairman & CEO. **"Musicland's leading mall position, combined with our opportunity to transform their product offerings to include MP3 players, cellular, satellite systems, digital imaging, gaming and expanded accessories, will allow Best Buy to capitalize on the strength of the digital product cycle."**

\*    \*    \*

Musicland Group, established in 1956, is the number one mall-based retailer of pre-recorded home entertainment products. The company's more than 1,300 retail stores attract over 300 million customer visits each year. Musicland employs 14,000 people in 49 states, including Puerto Rico and the US Virgin Islands under the names: Sam Goody, Suncoast, Media Play and On Cue. The company reported revenues of $1.89 billion and earnings of $58.4 million for its year ended December 31, 1999.

\*    \*    \*

Schulze added, "Best Buy's vision is to be at the intersection of technology and life. To realize this vision, we must come to market using a variety of branding concepts and operational formats. **This growth strategy accelerates the implementation of our vision through new customer segments and substantiates our presence as the world's preeminent technology and entertainment player."** [Emphasis added.]

32.    On February 1, 2001, Best Buy completed its acquisition of Musicland in a transaction valued at more than $680 million. The Musicland acquisition represented the key component in Best Buy's strategic diversification and growth plans.

33.    On February 5, 2001, Best Buy announced "the creation of three positions to coordinate the integration and transformation of the Musicland organization." The press release stated, in pertinent part, as follows:

"The integration and transformation of Musicland requires the talents of the combined Musicland and Best Buy teams to be successful. Together, we plan to create a stronger, more profitable model for our four retail formats," said Musicland President Kevin Freeland.

Effective immediately, three Best Buy executives join the Musicland Group. Rob Willey has been promoted to Vice President - Acquisition Integration. Willey has been Director of Brick and Mortar Strategy with Best Buy for three years. Willey

-10-

will report to Musicland Chief Operating Officer Keith Benson. "Willey and Benson will head the combined integration teams representing both organizations." Freeland said.

34.     Later that month, in mid-February 2001, at a joint meeting of Best Buy and Musicland management, the Company's detailed objectives for transforming Musicland stores – primarily its Sam Goody mall based stores – were set in motion. At the meeting, Best Buy management presented its plan to significantly expand Musicland's business presence in all consumer entertainment product markets representing a significant departure from Musicland's historical product base of prerecorded music. In addition, plans were made to make wholesale changes to the physical layouts of nearly all Sam Goody stores in order to accommodate the broader product selection. The remerchandising and remodeling of the Sam Goody stores was planned to start sometime in or around mid-March 2001 and be completed by the Fall of 2001, prior to the all important holiday shopping season.

35.     Then, on August 28, 2001, Best Buy issued a press release announcing that the integration of Musicland operations was "winding down." The press release represented that the Musicland integration was substantially complete and that certain executives appointed to the integration team in February 2001, were being reassigned to other duties. The press release stated in pertinent part:

> "With the winding down of our acquisition integration activities, we are pleased to have someone of [Rob Willey]'s caliber, with experience in inventory and procurement strategies to support our growing business," said Connie Fuhrman, Musicland's Executive Vice President--Merchandising.
>
> Willey joined the company earlier this year as Vice President, Acquisition Integration, and played an integral role in the acquisition of [Musicland] by Best Buy.

36.     On December 6, 2001, Best Buy issued a press release announcing its financial results for the quarter ended December 1, 2001 ("Q32002"). The press release highlighted the positive impact of the remerchandising program stating in pertinent part as follows:

> Sales at Musicland stores were up slightly compared with the third quarter of fiscal 2001, amid a decline in mall traffic, particularly after Sept. 11. Sales of prerecorded music and consumer electronics declined. However, sales of DVD movies continued to increase significantly, **benefitting from the remerchandising of Sam Goody stores as well as an increase in the installed base of DVD hardware and strong new software releases.** Sales of video game hardware and software also jumped. Gaming products now are sold at approximately 700 Musicland stores, up from 80 stores 18 months ago.
>
> **During the quarter, the Company began testing the introduction of new products at 20 rural On Cue stores and a transformed store environment at seven Sam Goody stores.** Musicland currently operates approximately 610 Sam Goody mall stores, 382 Suncoast mall stores, 76 Media Play superstores and 233 On Cue rural stores.

### The Musicland Acquisition Was A Complete Failure And The Company's Efforts To Remerchandise Musicland Stores Was Unsuccessful

37.     By the start of the Class Period, unbeknownst to investors, Best Buy was experiencing severe and persistent operational and financial difficulties with Musicland. As detailed herein, Musicland's chain of Sam Goody stores were failing to perform according to internal expectations and the purported "remerchandising" was growing increasingly expensive and not producing the anticipated positive results. Given the trends that were readily apparent in Musicland's operating results and the costs of the remodeling, as detailed herein, Defendants knew that the Musicland acquisition was a failure and that Best Buy would have to rid itself of Musicland in the near future or be willing to sustain ongoing and increasing losses.

38.     A primary obstacle facing Best Buy in its efforts to remerchandise Musicland was the location of Musicland' retail stores. Contrary to Defendants' statements that Musicland had "leading mall positions", a majority of Musicland/SamGoody stores were located in sub-prime

shopping malls, which could not support the retail operations that were envisioned by the Company's remerchandising plans.

39.    According to a former Best Buy Director of Strategic Planning, who was employed by the Company during the Class Period (hereinafter referred to as "CI 1"), it was a well-known fact throughout the Company that the vast majority of Musicland stores could not be considered any higher than "level C or D" retail locations.[1] This objective measure of the sub-standard quality of Musicland's retail stores raised a substantial level of doubt concerning the viability of Best Buy's remerchandising efforts.

40.    CI 1 further stated that  based on the due diligence review completed at the time of the Musicland acquisition,  Defendants would have determined that Musicland's real-estate was "really bad" for the purpose of expanding store product selections to more expensive and higher-end consumer electronics products. CI 1 explained that the vast majority of Musicland stores could not be considered any higher than "level C or D" retail locations. CI 1 went on to explain that because a majority of Musicland/Sam Goody stores were primarily based in shopping malls they were ill suited to carry a large selection of products likely to appeal to more sophisticated consumer electronics purchasers which was precisely the type of consumer that Defendants were targeting with Best Buy's store transformation strategy. CI 1 stated that formal marketing studies available to Defendants at the time of the Musicland acquisition, or shortly thereafter, clearly demonstrated that shopping mall customers are typically "women and children" – not the consumers of high-end and high priced consumer electronics products. Thus,

---

[1] Commonly used ratings based on sales productivity, demographics, consumer traffic and other factors where "A" would be the highest rating.

-13-

Defendants' representations that Best Buy's store transformation was taking hold and that increasing consumer response was simply a matter of "familiarization" with Musicland/Sam Goody's expanded product offerings were lacking in a reasonable basis at all times.

41.    In order to create the impression that the remerchandising was successful and would drive future growth, Musicland was engaged in a high risk program of heavily discounting its products in order to compete with mass merchandisers and big-box consumer electronic retailers. According to numerous former employees of the Company, Musicland was discounting its consumer electronics products so steeply – cutting prices to 5% - 10% above cost – that it was unable to cover overhead costs at a majority of its retail stores. This discounting strategy provided a short-term boost to Musicland's operating results, thereby making it appear that the Company's remerchandising plans were positively impacting the Company's financial results. Defendants, however, knew that the discounting could not be continued over the long-term.

42.    The problems attendant to the remerchandising and remodeling program and Musicland's declining financial results were known to the Individual Defendants, as detailed below.

43.    According to a former Best Buy Director of Marketing, employed by the Company during the Class Period ("CI 2"), defendants Schulze and Anderson regularly participated in ad-hoc conference calls on a daily and weekly basis, in addition to regular scheduled meetings, during which various PowerPoint presentations prepared by CI 2 were used to discuss the shortfalls being encountered as Best Buy's remerchandising strategy for Musicland /Sam Goody progressed. CI 2 further explained that during these calls and meetings the problems of remerchandising Musicland/Sam Goody were not "sanitized" but dealt frankly

-14-

with the failure of the programs, often resulting in substantial modifications. Unfortunately for the members of the Class, the same cannot be said of Defendants' public statements during the Class Period. CI 2 recalled, the original "re-merch" plan, as it was known internally throughout the Company, had been version "1.1." but by the time CI 2 left they were up to revision "3.8."

44.    Specifically, CI 2 recalled that defendants Schulze and Anderson regularly attended meetings/teleconferences where Musicland's "negative price halo" (i.e., consumer perception that Musicland products were over-priced) was openly discussed and discounting strategies devised to attempt to overcome it. CI 2 said that a number of different strategies were developed and tried out. For example. in an effort to overcome the negative price halo associated with the Sam Goody brand. prices were lowered on audio/video entertainment items to the point that the Sam Goody stores were charging only 5% - 10% over cost. CI 2 also stated that Defendants were well aware of the failure of these strategies to overcome the consumer perception and negative brand image that Sam Goody was over-priced. During the Class Period, Defendants public statements regarding declining operating margins at Musicland/Sam Goody stores, attributed the declines to increasing sales of "lower margin" products introduced during the remerchandising, without disclosing the high-risk nature of the discounting programs.

45.    Moreover, CI 1 explained that the discounting programs instituted by Defendants were a major reason for the rapid deterioration of Musicland's financial performance at the end of the Class period and shortly thereafter. CI 1 stated that the Musicland/Sam Goody stores were simply too small to carry the volume of products need to make the remerchandising strategy a success. Additionally, CI 1 stated, the high overhead costs of the mall based Sam Goody stores placed them in a loss position once the steep discounting programs, described above, had been started. In particular, CI 1, provided the following example of average Musicland/ Sam Goody

-15-

store's inability to price any of its product offerings – including its traditional line of music

products profitably – given the existing competitive environment during the Class Period:

> Musicland had 1400 stores, 950 of which sold predominantly music and were
> based in malls that typically had rents of $28 per square foot. Given this high
> overhead cost on real estate alone, the Musicland/Sam Goody music stores ended
> up having to charge $2 - $4 more for an equivalent CD or DVD than did
> competing "big-box" retail stores, *including Best Buy itself*, simply to
> compensate for this high overhead. The big-box stores could afford to sell the
> same product for less because these large stores did not have the same high
> overhead costs. Furthermore, Best Buy could afford to be a "loss-leader" on CD
> and DVD sales because these sales were typically ancillary to the primary
> purchases of higher-priced electronic equipment and appliances made by most
> Best Buy customers. *Lowering prices [on CDs] was tried, but was unsuccessful
> as well.* [Emphasis added.]

46.     Contrary to Defendants' public statements, detailed herein, the remodeling of

Musicland/Sam Goody stores during 2001 caused major disruptions to the Company's sales

efforts, fell far behind schedule – so that fully one third of the 600+ Sam Goody stores which

Defendants planned to remodel by Fall 2001 had not been completed by the start of the holiday

shopping season – and cost far more than Defendants had anticipated. Numerous former

employees of the Company estimate that the shortfalls of Best Buy's remodeling effort were a

major reason for Musicland's declining financial performance during the Class Period.

47.     According to a former employee of the Company, as early as October 2001,

Defendant Schulze was on notice that the integration of Musicland's operations was facing

severe problems and contrary to Best Buy's August 2001 statement was not winding down.

Specifically, a former Best Buy Retail Process Manager employed by the Company during the

Class Period ("CI 3"), attended a meeting in "September or October 2001," also attended by

defendant Schulze, other Best Buy senior management and many of the individuals associated

with the Sam Goody integration and remodeling effort, as well as by members of the Company's

-16-

logistics, operations, inventory control/distribution and marketing teams. CI 3 estimated that approximately 50 to 60 employees attended the meeting which lasted about 2 hours.

48.     CI 3 stated that the purpose of the meeting was to discuss and review the problems/challenges Best Buy was having generally with the Musicland integration. More specifically, the discussions focused on the litany of problems the Company was having with the Sam Goody remodeling. CI 3 recalled that the discussions soured as the meeting progressed, and the conversations became more heated. For example, CI 3 recalled that defendant Schulze stated that he could not understand why the Company was having such difficulties with the Sam Goody remodeling initiative. CI 3 further stated, Schulze made a comment that he was "sick and tired" of "reading reports every day about what is going wrong." CI 3 also stated that Schulze waved around a bunch of papers while he was "screaming at us" about all the challenges and problems. At some point, Schulze wadded up the papers he had been waving around, and threw them at Rob Willey. CI 3 also recalled that Schulze did not seem to tolerate Wiley's explanations as to why the Company was having such problems. CI 3 said, "Mr. Schultz didn't seem real interested in what [Willey] was telling us. He wasn't buying it at all."

49.     Numerous other former employees of the Company both at the corporate and store levels confirmed that problems associated with the Musicland integration and Sam Goody store remodeling/ remerchandising efforts continued to undermine Best Buy's sales efforts prior to and during the Class Period. For example:

        a)     CI 4, a former National Purchasing Manager for Best Buy employed by the Company during the Class Period, stated that inventory and purchase control issues became problems after the Musicland acquisition. As an example, CI 4 stated that in early 2002 , a large order of movie and music CDs was doubled up on. Apparently, the order was slated for the Best

-17-

Buy stores, but was sent to Musicland. In turn, the Best Buy purchasing manager resubmitted the order. According to CI4, the net result was that the Company ended up with a very large amount of entertainment products that they did not need. Additionally, *CI 4 stated that remerchandising of the Sam Goody stores with various lines of consumer electronic products had been recognized as a failure as early as 2001*, when large shipments of consumer electronic products that had been designated for the Sam Goody stores "ended up" being subsequently placed into Best Buy stores simply because it did not sell as anticipated in the Sam Goody stores. CI 4 remembered that this became a significant area of concern for Best Buy's senior management during the second half of 2001, and continued to be an issue well into 2002. Specifically, CI 4 recalled that significant amounts of low to mid-range consumer electronic products (e.g. CD players, headphones, Walkman units) were purchased for the Sam Goody stores. CI4 stated that this unsold inventory ended up causing an inventory problem in the core Best Buy stores. In turn, CI 4 recalled that the Company was ultimately forced to take write-downs on the merchandise in order to get rid of it and did not believe there was any price guarantee or protection from the vendors for the unsold inventory.

        b)     CI 5, a former Delivery Distribution & Warehouse Manager for Best Buy employed by the Company during the Class Period, also confirmed that as early as February 2002 large shipments of consumer electronics goods placed in Sam Goody stores as part of Best Buy's remerchandising efforts were being returned to the warehouse because they could not be sold. CI 5 stated that in or around February 2002, the Carol Stream warehouse received approximately seven or eight pallets of electronic products that had been pulled out of some of the Sam Goody stores in the upper Midwest region. CI 5 further stated that these returns consisted of a wide assortment of electronic products, such as PADS, DVD players. portable CD

-18-

payers, MP3 machines, speakers and interactive entertainment products. CI 5 estimated that the total value of these goods was "several hundred thousand" dollars. Additionally, CI 5 stated that the seven or eight pallets of electronic products that arrived in the Carol Stream warehouse facility in February 2002 were only the first of several shipments of electronic goods pulled out of the Sam Goody stores that ended up being shipped to Carol Stream. As CI 5 recalled, three to four similar shipments were received every month for a period of about seven months from February 2002 onward. CI 5 stated that each shipment, like the first, represented as many as eight pallets, each of which held thousands and tens of thousands of dollars worth of inventory.

c)    CI 6, a former National Retail Operations Manager for the Musicland Group employed by the Company during the Class Period, responsible for overseeing the daily operations of many of the Company's Sam Goody and Suncoast stores. CI 6, stated that Musicland/Sam Goody remerchandising and remodeling initiatives proved to be extremely disruptive to the daily operations of many stores and, ultimately, caused Best Buy significant business problems in 2001 and 2002. CI 6 provided approximate start and end dates for each of the initiatives stating that both were launched at a meeting in the Company's headquarters in mid-February 2001, the remerchandising effort began in March 2001 and lasted for the "next several months." The remodeling efforts also started in March 2001 and were to be completed by Fall 2001, prior to the start of the holiday shopping season. CI 6 stated that problems with the remodeling effort began to appear "within weeks" of the launch of the store transformation initiative. Specifically, CI 6 stated that there were numerous instances where the reset teams (i.e., construction crews) would show up at a store to begin the physical remodeling, only to discover that the remodeling kits for that specific store were not there. Obviously, this caused considerable disruption to both the construction crew as well as store employees who had

-19-

prepared their store to conduct business during construction. CI 6 estimated that the logistical problems doubled the length of time estimated to complete the remodeling. During that time CI 6 estimated that stores' revenues were down by approximately 60%. Overall CI 6 estimated that for each of the approximately 400 Sam Goody stores remodeled during 2001 the estimated revenue loss for the two-week period of the remodeling was "better than 50%." CI 6 also stated that due to numerous other delays and logistical problems encountered during the remodeling effort more than 250 Sam Goody remained to be remodeled as the Company entered the holiday shopping season of November December 2001.

d)     CI 7, a former District Manager for 12 Sam Goody and rural On Cue stores with more than $12 million in annual sales, confirmed that the remerchandising and remodeling efforts in the district seriously disrupted the stores' operations. Moreover, CI 7 stated the district's stores were remodeled and remerchandised in or about April 2001and that the remodeling efforts fell behind schedule from its inception due to a high number of construction delays and incomplete or incorrect merchandise shipments. CI 7 also stated that Defendants were on notice of the poor performance the district's stores following the remerchandising due to "sell-through reports" that were required to be submitted to the corporate office within weeks of the April 2001 remerchandising. CI 7 stated that PADS and wireless Internet devices placed for sale in the district's rural On Cue stores were among the slowest moving items. CI 7 also stated that within 60 days of the remerchandising, sometime in June 2001, Best Buy began issuing directives to "rotate"the slow-moving stock to other stores or send it back to the Company's warehouses.

e)     CI 8, a former Assistant Store Manager for Musicland employed by the Company during the Class Period, was notified by Best Buy in May 2001 that the store was

-20-

scheduled for remodeling in "about 6 or seven weeks." CI 8 stated that the remodeling of the store was delayed about one week. CI 8 also confirmed that the delay caused problems in the store because most, if not all, of the store's merchandise had been moved to different locations in preparation for the remodeling. CI 8 stated that it was difficult to find some items, and many customers simply went elsewhere.

f)      CI 9, a former Store Manager for Sam Goody employed by the Company during the Class Period, confirmed that inventory shrinkage was also a negative consequence of the store transformation effort. The display fixtures and merchandise placements called for in the "plan-o-grams"[2] left expensive merchandise readily exposed to potential shoplifters. CI 9 stated that increasing shrinkage was also a problem in most other Sam Goody stores that were reset in 2001 and early 2002, based on conversations with peers.

g)      CI 11, a former regional Market Trainer for Musicland Group employed by the Company during the Class Period, stated that Best Buy failed to implement an effective or comprehensive product training program for the Sam Goody retail associates. Specifically, CI 11 said Best Buy did a "very poor job" of providing adequate training in regard to product knowledge for the new merchandise lines that were introduced into the Sam Goody stores as part of the remerchandising initiative. For example, CI 11 stated that Best Buy introduced the Palm Pilot PDA into the Sam Goody stores as part of its remerchandising program. However, there was virtually no product training provided to Sam Goody retail associates as to how to use a

---

[2] CI 10, a former Best Buy Merchandise Manager employed by the Company prior to the Class Period, explained that ""plan-o-grams" described core merchandise programs grouped within the Company's online corporate database system which allowed the Company's senior management team (including the Individual Defendants) to have immediate access to all store business and sales information.

Palm Pilot. CI 11 also stated that the Sam Goody lost a considerable number of sales simply because sales associates did not know how to sell most electronic and technical products.

h)    CI 12, a former Senior Assistant Store Manager employed by the Company during the Class Period, also confirmed that Best Buy's training program for Sam Goody's retail associates was "poor and ineffective." CI 12's store was remodeled and remerchandise during August 2001. CI 12 stated that training on the high-end electronic products that Best Buy placed in the Sam Goody stores was particularly problematic. CI 12 commented, *"Most of our people had no clue about all that stuff."* CI 12 also confirmed that the Company's expectations for sales of electronic equipment were not met in the store. CI 12 stated that many sales were lost simply because sales associates did not know how to sell most electronic and technical products. CI 12 further stated that customers told him on many occasions that they (the customer) would "just go upstairs to Radio Shack" to purchase electronic products because of the of the Sam Goody retail associates lack of product knowledge. CI 12 was not able to quantify what the total dollar amount of sales for electronic equipment was supposed to be, but it was understood that electronic equipment was supposed to account for as much as 50% of the store's total sales. CI 12 could not quantify the extent by which sales of electronic equipment fell short of expectation, but he characterized the shortfall as "significant." CI 12 also stated that inventory shrinkage was a major problem at the store after the remerchandising effort. In fact, CI 12 said that the amount of shrinkage related to electronic products exceeded the amount of actual sales and therefore he believed that the electronics product line represented an overall loss for the store.

50.    Finally, contrary to Defendants' pre-Class Period representations, the Musicland integration into Best Buy was incomplete as numerous significant operational issues had yet to

-22-

be sufficiently completed. For example, the Company's inventory management and purchase control systems were severely and adversely impacted. According to several former Best Buy employees, major problems with the Company's inventory control systems, including but not limited to large discrepancies between physical and book inventory amounts, inaccurate data entry due to lack of training of Musicland personnel, SKU conversion problems and growing shrinkage due to increased security problems. For example, one former Best Buy National Purchasing Manager recounted that orders were frequently doubled up and misrouted subsequent to Best Buy's purported integration with Musicland operations with the "net result [...] that the Company ended up with a very large amount of entertainment products that they did not need."

### Materially False And Misleading
### Statements Issued During The Class Period

51.    The Class Period begins on January 9, 2002. On that date, Best Buy issued a press release announcing "initial guidance for its fiscal year ending March 2003 ("FY2003") results, based on current business trends, comparable store sales gains and new store growth plans." The press release stated in pertinent part as follows:

> Earnings growth is anticipated to be 18 to 21 percent in fiscal 2003, on top of projected earnings growth in the current fiscal year of nearly 30 percent. Growth drivers are expected to be an increased market presence in the U.S., **including new store openings in the coming year, as well as the benefits of remerchandising many of the Company's Sam Goody stores and contributions from the Future Shop acquisition.** [Emphasis added.]

Defendant Schulze commented on the announcement stating in pertinent part as follows:

> Best Buy's goal is to be a consistent top-quartile performer among all retailers. I am pleased that we are on track to deliver at that level yet again in the current fiscal year. We intend to build on the current year's success with another strong performance in fiscal 2003.

-23-

52.    Bolstering the Company's highly positive earnings growth forecasts, on January

9, 2002, Best Buy announced its December 2001 sales results. The Company reported that same

store December 2001 sales[3] increased by 6.8% with Musicland recording same store sales up by

3.8%. Defendants obliquely attributed the positive Musicland results, in part, to the

"remerchandising efforts" purportedly completed at most Sam Goody stores during 2001. The

press release stated in pertinent part as follows:

> **The increase reflected market share growth and the remerchandising of most
> Sam Goody stores to include more DVD movies, video gaming hardware and
> software, and consumer electronics.** [Emphasis added.]

53.    On or about January 9, 2002, the Company hosted an analysts' conference – the

"Best Buy Consumer Electronics Show." During the conference, defendant Lenzmeier, provided

additional details about the purported success of the Company's Musicland/Sam Goody store

transformation efforts. A transcript of Lenzmeier's statements, published by *Fair Disclosure

Wire,* stated in pertinent part as follows:

> A variety of changes are going on at Sam Goody, adding advertising for the
> overall and changing pricing in different marketplaces, changing assortments in a
> more radical way, and changing the physical look of the store. In the small
> markets, Sam Goody stores were opened as opposed to On Cue and are beginning
> to get the first data back from that, which will color substantially what is being
> done in the new stores. **Sam Goody stores opened are doing substantially
> better than the On Cue stores, thus enabling the building of a larger brand
> identity for Sam Goody and expanding the chain at a more rapid rate.** There
> is an opportunity with the On Cue stores to open another 800 stores over the
> course of the next number of years based on the current results. There was a
> tremendous amount of integration as part of this strategy. The accounting
> department, communications, have [all] been shared with Musicland. Able to
> constrain or reduce actual operating cost. **All the efforts have been successful
> and have achieved all of the synergies that were expected in the first year,
> which is a big achievement.** [Emphasis added.]

---

[3] Including only stores opened for more than 14 months.

-24-

54.    Prior to the stock market opening, on or about January 10, 2002, Bear, Stearns & Co. Inc. (analysts D. Telsey and J. Feldman) ("Bear Stearns") issued a highly positive report on Best Buy's outlook, incorporating and adopting FY2003 earnings guidance provided by defendants and reporting on Musicland's seemingly improving performance. The report stated in pertinent part as follows:

> [On Wednesday, January 09, 2002] [t]he [C]ompany provided new guidance for [FY2003], which includes projected sales and earnings growth of 17%-20% and 18%-21%, respectively. We estimate [FY2003] sales growth of 16.9% to \$23.5B vs. an estimated \$20.1B in FY02, with same-store sales growth of 2.2% vs. a projected 1.4% in FY02. [...] We think all of this could translate into **[FY2003] EPS growth of approximately 19.4% to \$2.83 vs. a projected \$2.37 in FY02** and \$1.86 in FY01.
>
> \* \* \* \* \*
>
> MUSICLAND CONTINUES TO IMPROVE. Same-store sales were better than expected at Musicland, up 3.8% in December despite a decline in mall traffic (about 80% of the division s store base is in malls). Large increase in sales of DVD movies (up double digits) and video game hardware and software (up triple digits) more than offset sales shortfalls in pre-recorded music and VHS movies. **The strength in the video game category resulted from the launch of new video game platforms (i.e., Microsoft s Xbox and Nintendo s GameCube), the remerchandising of the Sam Goody stores, and the Game Zone re-merchandising at Media Play stores. [...] The company is still working on its expansion plans for the Musicland division for FY03. However, BBY expects same-store sales in this group to be 3%-5% in [FY 2003], driven by DVD movies and video gaming, offset by continued weakness in prerecorded music.** Comps are expected to remain under pressure for 1H03 and pick up in 2H[FY2003]as the re-merchandising efforts in this division are in place and begin to take hold. [Emphasis added.]

55.    The statements referenced above in ¶¶ 51-53 were each materially false and misleading when made as they failed to disclose and misrepresented the following adverse facts which were known to Defendants or recklessly disregarded by them:

-25-

(a)    that Best Buy 's mall-based Musicland/Sam Goody stores were located in sub-prime locations and as a result were performing poorly, requiring that Best Buy shrink the sizes of such Sam Goody stores and close some Sam Goody stores altogether;

(b)    that many of Best Buy's Musicland/Sam Goody stores were inadequate both in size and location and were unable to accommodate the entertainment software, consumer electronics products and personal computing products placed in the stores as part of the Company's remerchandising efforts;

(c)    that the Company was incurring additional costs and expense to rotate millions of dollars of inventories of consumer electronics products placed in Musicland/Sam Goody stores as part of its remerchandising program because the products could not be sold by the Musicland/Sam Goody stores in sufficient quantities or at competitive prices thus materially depressing Best Buy's operations and earnings even further;

(d)    that Best Buy had failed to adequately train Musicland/Sam Goody retail sales associates in the sale of consumer electronics products and personal computing products resulting in additional lost revenues;

(e)    that the Company's integration with Musicland's operations was not successful and had adversely impacted Best Buy's inventory controls, purchasing controls and inventory security causing the Company to incur additional losses and expenses;

(f)    that the Company's remodeling of Musicland/Sam Goody has not been successful in fact more than 200 of the Sam Goody stores originally planned to be remodeled by the Fall of 2001 had not been remodeled due to construction delays, logistical problems and inadequate planning causing the Company to incur additional lost sales opportunities;

-26-

(g)    that Musicland was engaged in a program of heavily discounting its products in order to compete with mass merchandisers and big-box consumer electronic retailers. Musicland was discounting its consumer electronics products so steeply – cutting prices to 5% - 10% above cost – that it was unable to cover overhead costs at a majority of its retail stores. This discounting strategy provided a short-term boost to Musicland's operating results, thereby making it appear that the Company's remerchandising plans were positively impacting the Company's financial results. Defendants, however, knew that the discounting could not be continued over the long-term;

(h)    based on the foregoing, the Musicland acquisition was a failure and the Company's investment in its Musicland subsidiary, including the Company's carrying value of goodwill and other intangible assets were materially overstated as the Company was saddled with a money-losing chain of stores;

(i) that Best Buy was experiencing growing competition from mass discounters such as Wal-Mart, which was devoting more advertising to electronics to increase consumer awareness of its presence in the category and materially impacting Best Buy's profit margins; and

(j) as a result of the foregoing, defendants lacked a reasonable basis for their positive statements about the Company and their earnings projections, which were materially false and misleading at all times.

56.    Then, on or about January 10, 2002, Best Buy issued a press release announcing the private offering of approximately $350 million in convertible debentures, with maturities of 20 years and into shares of Best Buy common stock at a conversion price of "$103.50 per share (a 37.7 percent premium over the January 9 closing price of $75.16 on the New York Stock

Exchange) if the closing price of the Company's common stock exceeds 120% for a specified

period of time, or otherwise upon the occurrence of certain events."

57.    On or about  January 11, 2002, Bear Stearns issued a report raising its rating of

Best Buy common shares from "Neutral" to "Attractive" – establishing a 12-month price target

of $85 per share.

58.    On or about February 25, 2002, Best Buy issued a press release announcing that

defendant Schulze would step down as Chief Executive Officer effective June 30, 2002 to be

replaced by defendant Anderson.  The press release stated, in pertinent part, as follows:

> Anderson said, "It's an exciting time to be assuming this role, as we near the
> completion of what will be a banner year, with record sales and earnings. This is a
> very talented team, including many of the leaders who pulled together to restore
> our leadership in very difficult times six years ago. I have utmost confidence in
> the ability of this new group of leaders to embrace change and to continue our
> tradition of leadership in the industry."

59.    On or about February 28, 2002, Best Buy announced higher earnings guidance for

the fourth quarter fiscal 2002 ("4Q2002").  The press release stated in pertinent part as follows:

> [... F]ourth-quarter sales remain on plan and that its **earnings for the fourth
> quarter, which ends on Saturday, March 2, are expected to exceed the
> Company's earlier guidance** of $1.35 to $1.40 per share. The current consensus
> estimate, according to First Call, is earnings of $1.38 per share.

60.    The statement referenced above in ¶ 59 were each materially false and misleading

for the same reasons set forth in ¶ 55.

61.    On or about March 7, 2002, Best Buy issued a press release announcing that sales

revenues had increased by more than 28% during the fourth quarter 2002 compared to the prior

year.  The Company raised 4Q2002 earnings guidance for the second time during the Class

Period, based on  sales trends indicating an 80% increase in earnings from the previous year.  In

addition, the Company spoke in highly positive terms concerning Musicland sales results. The press release stated in pertinent part as follows:

> Comparable store sales at Musicland stores rose 1.2 percent compared with the fourth quarter of fiscal 2001, despite a decline in mall traffic and soft sales of prerecorded music and VHS movies. Musicland sales, which totaled approximately $680 million in the quarter, benefitted from new video game platforms as well as an increase in the installed base of DVD hardware. **The change in product mix - including more video gaming hardware and software, and devices that play movies and music - drove an increase in the average purchase per customer.** Musicland currently operates approximately 615 Sam Goody mall stores, 400 Suncoast mall stores, 76 Media Play superstores and 230 On Cue rural stores. [Emphasis added.]

62.    On or about March 7, 2002, Thomson Financial/First Call (analyst J. Butters) ("First Call") issued a report on Best Buy noting that the Company's sales announcement, detailed above, marked "the fourth time" Best Buy commented on its 4Q2002 earnings since it reported exceeding consensus analyst estimates for 3Q2002 earnings by $0.01 per share on December 18, 2001. The First Call report further noted that sixteen of twenty-two analysts covering the Company issued reports on March 7th, each of the reports raised earnings estimates based on the Best Buy's "better than expected" sales results. For example:

(a)    Sun Trust Robinson Humphrey (analyst D. Schick) ("Robinson Humphrey") issued a report maintaining the firm's "Outperform" recommendation and raising FY2003 earnings estimates by10% to $3.15 per share in line with guidance provided by defendants. The report noted, "**[r]emerchandising efforts at Sam Goody and Media Play are shifting [product] mix towards higher volume movies and video games resulting in increases in average ticket per customer.**" [Emphasis added.]; and

(b)    Deutsche Banc Alex. Brown Inc. (analysts D. Wewer and V. Ma) ("Deutsche Banc") issued a report maintaining the firm's "Buy" recommendation and

establishing a 12-month price target of $90 per share. The report described Best Buy as "best in class" among all consumer electronics retailers. Deutsche raised FY 2003 earnings estimates by 6.9% to $3.09 per share in line with guidance provided by defendants.

63.    Defendants' false and misleading statements concerning the Company's earnings prospects and the successful r]emerchandising of its ailing Musicland chain had their intended effect. Following Best Buy's highly positive 4Q2002 sales report – **accompanied by Defendants' second increase to the Company's earnings guidance during the quarter** – as well as the positive reports of securities analysts, detailed above, **the price of Best Buy common shares rose by nearly 10% from its close on or about March 6, 2002**, to close at $75.40 per share on or about March 8, 2004. Less than two weeks later on or about March 20, 2002, Best Buy common shares reached a Class Period high closing at $80.05 per share.

64.    On or about April 2, 2002, Best Buy issued a press release announcing its financial results for 4Q2002 and the fiscal year ended March 2, 2002 ("FY2002"). The Company reported net earnings of $350 million, or $1.62 per share, for the fourth quarter of 2002. The press release also contained guidance and projections for fiscal 2003 stating in pertinent part as follows:

> Best Buy Founder, Chairman & CEO Richard M. Schulze [stated] . . . "Our Musicland stores met our profitability targets despite reduced mall traffic, due to expense control and our r]emerchandising of Sam Goody stores . . . **Our strong finish to the quarter and the year builds our optimism for the year ahead," Schulze added. "We expect continued growth in revenues and earnings as we open new stores, leverage expertise across our brands and benefit from an improving economy."**

> *   *   *

> Darren Jackson, Senior Vice President - Finance and CFO, said, "The first quarter's sales to date are modestly ahead of our original expectations. Comparable store sales are on track to be 3 to 4 percent in the first quarter and for

the fiscal year. We anticipate earnings per share of approximately $0.30 to $0.32 in the first quarter. **Overall, we continue to anticipate revenues growth of 17 to 20 percent, and earnings growth of 18 to 21 percent for fiscal 2003, or $3.15 to $3.25 per share."**

65.     During a conference call with analysts and investors following the Company's

FY2002 earnings announcement, Defendants represented to investors that **Musicland's**

**financial performance exceeded the Company's expectations** and that Best Buy's

remerchandising strategies – especially at mall-based Sam Goody stores –  had more than offset

**and would continue to offset** other negative industry trends: declining prerecorded music sales;

and decreased consumer traffic in the nation's shopping malls.  A transcript of the call published

by *Fair Disclosure Wire*,  stated in pertinent part as follows:

> [Defendant Schulze]: All three of our businesses exceeded expectations for the quarter. Best Buy stores operating earnings grew 60 percent, reflecting sales increases, gross profit expansion and tight expense control. [During 4Q FY 2002] **Musicland contributed 17 cents per share of accretion, a penny better than our original forecast of 16 cents. For the first fiscal year of operations, Musicland contributed earnings of one cent per share, in line with our original guidance.**
>
> * * * * *
>
> [Defendant Schulze]:  Secondly, we have positive overall comps of 1.2 percent for [4Q FY 2002] at Musicland, despite a significant decline in music sales nationally, as well as substantially reduced mall traffic after September 11th. **Comp sales in Musicland's mall locations outpaced, by seven percentage points, overall mall traffic figures, which showed an average decline of six percent for the year.** The positive comps were driven by gain[s] in sales of movies, as well as video gaming. Sales of movies slightly surpassed sales of music for this quarter, **consistent with our strategy of diversifying the overall revenue mix.**
>
> * * * * *
>
> [Defendant Lenzmeirer]: We were pleased to achieve our operating targets at Musicland for the fourth quarter and fiscal 2002, including one cent per share of accretion for the first full year of operations. [...] While comparable store sales for the year were down less than one percent, we achieved modest comparable store

-31-

sales gains in the fourth quarter, despite reduced mall traffic. **Our positive [comparable store sales] reflected our improved mix of business**, including faster growing products such as DVD software and video gaming, which offset continued declines in the sales of pre-recorded music. [...] **We expect comparable store sales to grow modestly as a result of the shift and mix combined with continued softness in the sales of music.** We do expect expense reductions to offset the margin erosion, as transpired in fiscal 2002. **We purchased Musicland in order to transform it as we did earlier at our Best Buy stores four to five years ago. In fiscal 2003, we intend to increase investments to transform these stores and reposition the business** to gain a larger share of wallet from our current customers, which are really the music, movie and gaming enthusiast.

66.     Additionally, on or about April 2, 2002, Best Buy issued a press release

announcing its intention to rename and remerchandise 200 of Musicland's On Cue stores under

the Sam Goody brandname, the press release stated in pertinent part:

> **"Last fall's test of the Sam Goody brand in rural markets showed dramatic improvements over the average On Cue store results both at opening and over time," said Kevin Freeland, president of Musicland stores. "The name change of the chain will allow us to capitalize early on the strong sales as well as leverage advertising and increase the efficiency of our field team."** As a result of the change, the converted On Cue stores will expand the video game and electronics areas. The stores will continue to carry the rural-market product mix which includes the same extensive selection of music and movies as all Sam Goody stores, in addition to computer software, books and musical instruments.

67.     During the conference call with analysts, later that day, defendant Lenzmeier, and

others, represented that the planned remerchandising of On Cue stores would cause **little if any**

**disruption to the chain's operations as had the Sam Goody remerchandising during FY**

**2002**. The *Fair Disclosure Transcript* stated in pertinent part:

> [Analyst]:With respect to the 200 on queue stores that are going to be converted, can you tell us [...] what type of a disruptions if any -- do you think you may see of these 200 stores during the conversion process?

[Defendant [4]]: [..] [Y]ou should know that **there really is not much disruption**, even though there's a lot of physical activity going on in the building. **Historically whenever we do those kinds of remodels, it almost signals a buying excitement or opportunity for consumers. So we don't look for really roll off in revenue out of those stores.**

[Defendant Lenzmeier]: Yeah, and we've go a team [sic] that we use from Best Buy as well, you know, is very experienced in going in and doing remodels so **this is a relatively quick process that doesn't cause a lot of disruption.**

[Defendant]: Yeah, we're very proud of the fact that last year, **the Musicland team actually re-merchandised 450 Sam Goody stores out of the 650 in something like a 90 day period of time. So they know how to do that.**

68.    The statement referenced above in ¶¶ 61 and 64-67 were each materially false and misleading for the reasons set forth in ¶ 55 above.

69.    On or about April 15, 2002, Best Buy announced that its Board of Directors had approved a "3-for-2 Stock Split," payment of the 50% dividend would be made on May 10, 2002.

70.    On or about May 30, 2002, Best Buy filed its Annual Report on Form 10-K for the fiscal year-ended March 2, 2002 ("2002 10-K") with the SEC. The 2002 10-K, signed by defendants Schulze, Andersen and Jackson, among others, confirmed Best Buy's previously announced financial results. Additionally, the 2002 10-K represented the following with respect to the Musicland acquisition and Best Buy's strategies with respect to Musicland and the Sam Goody stores:

Musicland is one of the largest national retailers of movies, prerecorded music, video games and other entertainment–related products with 1,321 stores in 49

---

[4] The *Fair Disclosure Wire* transcript did not identify the defendant responsible for making this statement. In opening remarks, J. Driscoll, Best Buy's Director of Investor Relations noted that defendants Schulze, Lenzmeier and Jackson, among others, were in attendance for the conference call. The Company should have no difficulty in identifying the speaker from its own recording or transcript of the call.

states, the District of Columbia, the Commonwealth of Puerto Rico and the Virgin Islands. **Our intention is to enhance the Musicland business by improving the customer experience and diversifying the revenue mix, thereby boosting sales productivity and profitability.** We also view Musicland's small-market stores as an attractive growth opportunity.

\* \* \*

Our vision is to make life fun and easy. **Our business strategy is to bring technology and consumers together in a retail environment that focuses on educating consumers on the features and benefits of technology and entertainment while maximizing overall profitability. We believe our stores offer consumers meaningful advantages in store environment, product value, selection and service, all of which further our objective of achieving a significant market share in the markets we serve. The acquisitions of Musicland, Magnolia Hi-Fi and Future Shop give us access to new distribution channels, more customer visits and the ability to leverage Best Buy stores' core competencies with their operations.** We also expect additional benefits from the cross merchandising of products and information sharing across our distribution channels.

\* \* \*

The following is an overview of the merchandise offered at each of Musicland's four retail store concepts:

*Sam Goody* - Sam Goody stores generally offer music entertainment products such as compact discs, DVD's, audiocassettes, music and movie videos, sheet music, music-inspired apparel, posters and other music-related accessories. **In fiscal 2002, we launched a new mix of products in Sam Goody stores. We doubled the assortment of DVD movies and introduced video gaming, categories that carry lower profit margins but are expected to generate higher sales growth. We also expanded our assortment of hardware products that play music and movies, a natural extension of Sam Goody's principal product offerings.**

The 2002 Form 10-K also reiterated details with respect to Best Buy's projections for FY2003

originally disseminated to investors prior to the Company's January 10, 2003, private debt

offering, as follows:

Outlook for Fiscal 2003

-34-

Looking forward to [FY2003], we are projecting earnings growth of approximately 18% to 21% from $1.77 per share in fiscal 2002 to approximately $2.10 to $2.17 per share in fiscal 2003. We expect the earnings growth to be driven by a 17% to 20% increase in revenues, maintaining the gross profit rate we delivered in [FY 2002] and modestly reducing our SG&A rate. **The projected earnings increase reflects a reduction in Musicland's operating income from $29 million in fiscal 2002 to approximately break-even in fiscal 2003 due to continued transformation initiatives. The reduction in Musicland's operating income is net of the $16 million decrease in Musicland's goodwill amortization expense as a result of adopting SFAS No. 142, Goodwill and Other Intangible Assets, at the beginning of fiscal 2003. In addition, our projections assume that the U.S. economy will continue to gradually improve in fiscal 2003.**

We expect total revenues to grow from $19.6 billion in [FY2002] to between $23.0 billion and $23.5 billion in fiscal 2003 due to new store growth, comparable store sales gains and the inclusion of a full year of Future Shop revenues. In fiscal 2003, comparable store sales are expected to increase by approximately 3% to 4%.

In [FY2003], our gross profit rate is expected to remain essentially even with the [FY2002] rate based on anticipated gross profit rate improvement at Best Buy stores and International, offset by a planned gross profit rate decline at Musicland. The anticipated gross profit rate improvement at Best Buy stores and International is based on a more profitable sales mix resulting from an increase in sales of higher-margin digital products. However, the rate of improvement is likely to be less than experienced in the prior fiscal year, as these and other products become more widely distributed through mass merchandisers and discount chains. **Musicland's planned gross profit rate decline in fiscal 2003 is due to the continued shift in the sales mix from higher-margin sales of prerecorded music to lower-margin sales of DVD movies and video gaming.**

Our SG&A rate is expected to decrease modestly in [FY2003]. The expected decrease is due to expense leverage, primarily in the second half of our fiscal year, as a result of the anticipated increase in comparable store sales and the expanding store base. The SG&A rate decline resulting from increased expense leverage will be partially offset by higher depreciation expenses related to our increased levels of capital spending in fiscal 2003 and higher medical coverage costs for our employees.

\*    \*    \*

We expect [FY2003] capital expenditures to be approximately $1 billion, exclusive of amounts expended on property development that will be recovered through the sale and lease back of the properties. The capital spending will

support the opening of approximately 60 Best Buy stores in the United States and six to eight in Canada, 30 small-market Sam Goody stores, eight to nine Future Shop stores and six Magnolia Hi-Fi stores. About half of the new U.S. Best Buy stores are expected to be 45,000-square-foot, Concept 5 store formats, and the other half are expected to be 30,000-square-foot, smaller market Concept 5 store formats. **In addition, fiscal 2003 capital spending will support the continued development of our information systems and infrastructure, the continued construction of our new corporate headquarters and the transformation and integration of Musicland and Future Shop stores.**

71.     During this time, Defendants continued to foster positive press reports and articles concerning the Company's Musicland chain. For example, on or about May 10, 2002, an article appeared in the *Minneapolis/St. Paul Business Journal* titled "On Cue Brand will become Sam Goody" and provided the following details with respect to Best Buy's transformation of its On Cue stores into Sam Goody stores:

Eden Prairie-based Best Buy Co. Inc. still plans to expand into small rural markets. Its strategy to do so, however, is no longer On Cue.

The company is rebranding its 200-plus On Cue stores by August, giving them the name and look of its larger Sam Goody chain. It has targeted about 750 markets where it will consider putting new stores in the next decade.

Best Buy's move stems from tests last fall when the company opened several small-market Sam Goody stores in U.S. markets normally reserved for On Cue sites.

Company officials compared test-store sales with those at On Cue stores and found staggering results, said Laurie Bauer, Best Buy spokeswoman. "The results showed dramatic improvements over the average On Cue results immediately and over time."

Bauer said Best Buy has yet to predict the bottom-line savings from the switch, but expects it to increase the bang from advertising and result in other efficiencies. The company plans to open about 30 rural-market stores this year and 70 more in each of the next two years.

It wasn't that On Cue stores were failures. As they became known in their various markets, they fared well, Bauer said. However, they started with zero brand recognition, unlike the well-known Sam Goody brand.

-36-

72.    On or about June 6, 2002, Best Buy reported on its sales results for the first

quarter of fiscal 2003 ended June 1, 2002 ("Q12003") as follows:

> At Musicland stores - which include Media Play, On Cue, Sam Goody and
> Suncoast stores - comparable store sales decreased 1.2 percent in the quarter,
> consistent with expectations . . . "Our 90,000 employees focus on helping
> customers make their lives easier and more fun, and that's what drove this level of
> performance," said [defendant Anderson]. "**We continue to anticipate earnings
> growth of 18 to 21 percent for the [FY2003]**, based on our expectations for
> store openings and comparable store sales increases as well as the inclusion of
> Future Shop's full-year results."

*    *    *

> The Company also opened two Future Shop stores in Canada, **closed a net of
> seven Sam Goody stores (which included the opening of one small market
> Sam Goody store)**, opened a net of one Suncoast store and opened three
> Magnolia Hi-Fi stores in San Francisco. Total retail square footage increased by
> approximately 1.5 percent to 32.9 million square feet . . . The 1.2-percent
> comparable store sales decline at Musicland stores resulted from continued
> softness in sales of prerecorded music, partially offset by increased sales of video
> gaming and DVD software. Total sales at Musicland stores were $384 million,
> essentially even with that of the first quarter of [FY2002].

73.    On or about June 18, 2002, Best Buy issued its financial and operational results

for Q12003, stating that it had earned $0.22 per diluted share and provided additional details

with respect to its Musicland operations, as follows:

> "**Our strong beginning for the year builds our confidence that we can
> continue to achieve top-quartile growth rates in sales and earnings**," Schulze
> added. "**We expect contributions from new store openings, comparable store
> sales gains and improved operating efficiency to drive our growth.**"

*    *    *

> Darren Jackson, Executive Vice President - Finance and CFO, said, "We currently
> expect comparable store sales to increase 4 to 5 percent in the second quarter,
> resulting in earnings per share of approximately $0.30 to $0.32 for the period.
> **This initial EPS guidance for the quarter includes a 4-cent dilutive impact
> from investments we plan to make to launch Best Buy stores in Canada,
> improve our efficiency at Future Shop stores and remerchandise Sam Goody
> stores.** In the second half, we still anticipate more leverage in our operating

results. For the fiscal year, we continue to anticipate revenue growth of 17 to 20 percent, and earnings growth of 18 to 21 percent, which represents a diluted EPS of $2.10 to $2.17 per share."

\* \* \*

BEST BUY CO., INC.
CONSOLIDATED CONDENSED BALANCE SHEETS
($ in millions)
(Unaudited)

|  | June 1, 2002 | June 2, 2001 |
|---|---|---|
| ASSETS |  |  |
| Current assets |  |  |
| Cash & cash equivalents | $1,245 | $466 |
| Receivables | 243 | 193 |
| Recoverable costs from developed properties | 81 | 100 |
| Merchandise inventories | 2,635 | 1,981 |
| Other current assets | 180 | 111 |
| Total current assets | 4,384 | 2,851 |
| Net property & equipment | 1,988 | 1,496 |
| Goodwill, net | 791 | 381 |
| Other assets | 92 | 81 |
| TOTAL ASSETS | $7,255 | $4,809 |

74.    During a conference call with analysts and investors, later that same day,

defendant Jackson, in his opening remarks reiterated Best Buy's previously issued earnings

guidance for FY2003 and expressed continued confidence in the Company's ability to achieve

its earnings projections. Additionally, defendant Schulze, answered questions from analysts

concerning Best Buy's growing inventory levels, Schulze commented on the $650 million

increase stating it was a planned event related to the Company's transition to an automatic

inventory replenishment system. The transcript of the conference call published by *Fair

Disclosure Wire*, reported the following:

> [Analyst]: Good morning. Question is inventory levels. The levels were overall
> just a little bit higher than expected. It looks like sales exceeded our expectations

-38-

and exceeded your plan. Can you comment on the quarter ending first quarter inventory levels and how you feel about the inventory situation going forward in the second quarter?

[Defendant Schulze]: Absolutely. That is a great question. So, average store inventories grew a little over 10 percent in the first quarter. At first glance, that might appear concerning. **What you should be aware of is right at the end of the first quarter, we had done a system conversion to our new retech management system. What we did in anticipation of that is to make sure that we brought in some extra inventory in the event and others have had challenges with ARP conversions in the past. I am glad to report, as we sit here today, we don't see those challenges.** We put inventories in the store in the event there were challenges. So, we are comfortable that even though the inventory grows, we will work through the inventory through the June-July time period and be back on plan. Essentially, our trailing turns are still at 7.4, which is where we wanted to be.

75.    On or about July 12, 2002, Best Buy filed its Amendment No. 3 to its Registration Statement on Form S-3 in connection with the registration of its .25% Convertible Subordinated Debentures due January 15, 2022 Convertible into Common Stock Guaranteed as to Payment of Principal and Interest by Best Buy Stores, L.P., and provided the following details with respect to its acquisition of Musicland:.

The acquisitions of Musicland, Magnolia Hi-Fi and Future Shop give us access to new distribution channels, new customers and the ability to leverage Best Buy Retail's core competencies to their operations. We also expect to accrue additional benefits from the cross merchandising of products and information sharing across distribution channels.

76.    On or about July 17, 2002, Best Buy filed its quarterly report on Form 10-Q for Q1 FY 2003, and provided the following details with respect to its projections for operations and earnings for fiscal 2003:

Outlook for Fiscal 2003

The following section should be read in conjunction with our Annual Report on Form 10-K for the year ended March 2, 2002.

**We expect annual operating performance to be in line with earlier guidance outlined in our Annual Report on Form 10-K for the fiscal year ended March 2, 2002.**

Looking forward to the second quarter, we are projecting earnings of $0.30 to $0.32 per diluted share compared with $0.26 per diluted share in the second quarter of fiscal 2002. An anticipated 23% to 24% increase in revenues, as a result of new stores and a comparable store sales gain of 4% to 5%, is expected to drive the earnings increase.

**We anticipate that our gross margin rate will decline by approximately 0.3% of revenues, reflecting sales mix changes at Musicland stores (principally increased revenues from lower margin DVD movies and video gaming) as well as continued softness in prerecorded music sales.** We also expect revenues from lower-margin computers to increase as a percentage of our sales mix in the second quarter. We expect these changes will be somewhat offset by the continued strength in higher-margin digital products revenues. The SG&A rate, in the second quarter, is expected to remain flat compared with that of the prior fiscal year.

**Second quarter earnings are expected to be reduced by approximately $0.04 per diluted share as a result of our investments in the r]emerchandising of Sam Goody stores, launching Best Buy stores in Canada and our profit improvement initiatives at Future Shop stores.**

77.    The statements referenced above in paragraphs ¶¶ 70 and 72-76 were each materially false and misleading for the reasons set forth in ¶ 55.

### The Truth Begins To Emerge

78.    On August 8, 2002, before the open of trading, Best Buy shocked investors when it announced that it was lowering its earnings outlook for fiscal second quarter, ending August 31, 2002 (Q2 FY 2003), to a range of 17 to 21 cents per diluted share, compared with prior guidance of 30 to 32 cents per diluted share.  The press release stated, in pertinent part, as follows:

> In revising its outlook, the Company cited declines in consumer confidence resulting in flat comparable store sales in the past four weeks, which reflected general softening across most product categories.

-40-

"Our June results were in line with our expectations, but comparable store sales softened significantly in July, finishing the month essentially flat," said [defendant Anderson]. "In light of the environment, we are closely monitoring sales and inventories, and identifying ways to pare expenses in the second half."

79.    Investor reaction was swift and brutal with Best Buy common stock dropping

from $30.80 on August 7, 2002 to $19.55 on August 8, 2002, or a one-day decline of more than

36%, on a day when the Dow Jones Industrial Average Index increased by more than 3%, and a

decline of more than 62% from the Class Period high of $52.63.

80.    An article titled "Best Buy sales flat; stock in tailspin" appearing on August 9,

2002 in the *St. Paul Star Tribune* quoted an analyst's reaction as follows:

> **"It was a sizable surprise, otherwise the stock wouldn't be off 40 percent,"** Scot Ciccarelli, managing director at Gerard Klauer Mattison in New York City, said of the earnings revision. He was one of several analysts to cut their ratings on Best Buy on Thursday.

81.    An article titled "Best Buy stock slips 7%" appeared on August 29, 2002 in the

*Minneapolis Pioneer Press* and summarized an analysts report detailing many problems at Best

Buy, as follows:

> The latest stock drop came after Goldman Sachs analyst Matthew Fassler said he expects Best Buy to step back from its aggressive longer-term growth targets, considering, among other things, the tough economy, growing challenges from mass discounters and **struggles in reformatting the chain's Sam Goody mall stores**.

> "The primary driver of Best Buy's recent sales challenge — and the broader sector's sales deceleration — is the softening in consumer spending on big-ticket durables." Fassler said in his note to clients.

> A Best Buy spokeswoman confirmed her company is identifying where it can pare expenses for the second half of the year but doesn't plan to cut its work force.

> Best Buy disclosed those intentions, she noted, earlier this month when it cut its profit estimate for the second quarter to between 17 and 21 cents per diluted share, down from the previous guidance of 30 to 32 cents.

-41-

Best Buy blamed falling consumer confidence for flat sales in July at its stores open at least a year, with that impact felt across all product categories.

**But Fassler contended Best Buy faces other issues beside the tough economy. The challenges include:**

**•Growing competition from mass discounters such as Wal-Mart, which is devoting more advertising to electronics to increase consumer awareness of its presence in the category. Wal-Mart "continues to drive price points down," Fassler said.**

**• Spending to enhance the high-tech look of their stores and raising the service level so far has not yielded expected revenue results.**

**Best Buy's revenue mix remains focused on increasingly commodity-driven consumer electronics, Fassler maintained.**

**• Sam Goody mall stores, which came from Best Buy's acquisition of the Musicland Group, remain "the primary drag" on earnings.**

**"We expect the company to continue to tinker with the mall-based units, trying to balance the desire to turn this business around with the need to limit R&D spending as it pares its cost structure," Fassler said.**

82.     On September 5, 2002, Best Buy released its financial and operational results for

Q2 FY 2003.  The press release stated, in pertinent part, as follows:

At Musicland stores - which includes Media Play, Sam Goody and Suncoast stores - comparable store sales decreased 3.4 percent in the quarter., up from 15 percent in the same period last year.

*     *     *

**In addition, it closed a net of nine Sam Goody stores (which included the opening of three small market Sam Goody stores).**

The 3.4-percent comparable store sales decline at Musicland stores resulted from continued softness in sales of prerecorded music, partially offset by increased sales of video gaming and DVD software. Total sales at Musicland stores were $380 million for the quarter, a 3-percent decline from the second quarter of fiscal 2002.

*     *     *

-42-

Decline in Fair Value of Acquired Assets Results In Non-Cash Impairment Charge

The Company today reported that it will record a non-cash impairment charge of $348 million (after tax), which is equivalent to $1.07 per diluted share, related to the Company's adoption at the beginning of the fiscal year of Statement of Financial Accounting Standard (SFAS) No. 142, concerning the accounting for goodwill. SFAS No. 142, issued in June 2001, requires that goodwill be reviewed annually for impairment, beginning within six months after adoption of the statement, rather than be amortized over a period of time. **"The recorded impairment charge reflects a practical and realistic view of the fair value decline in our Musicland and Magnolia Hi-Fi businesses," Jackson said. The charge represents a full write-off of the goodwill associated with the acquisitions of the two businesses, including $308 million (after tax) associated with Musicland** and $40 million (after tax) associated with Magnolia Hi-Fi. As required by SFAS No. 142, the impairment charge is recognized in first-quarter results and is reported as a change in accounting principle, thereby resulting in a revised first-quarter loss of $0.85 per diluted share.

**The Company said that its determination of Musicland's fair value was based on present expectations for the business in light of the current retail environment and the uncertainty associated with future trends in prerecorded music products. The Company intends to move forward with its plans to open new stores in both rural and mall locations through its Sam Goody and Suncoast concepts.** Similarly, the Company's determination of Magnolia Hi-Fi's fair value reflects recent sales trends and the current business environment, including an economic slowdown in the Pacific Northwest and reduced demand for high-end consumer electronics generally. As originally planned, the Company will open six Magnolia Hi-Fi stores this year.

"We continue to believe that our Musicland and Magnolia Hi-Fi businesses support our overall strategy of reaching more entertainment and technology enthusiasts, including rural customers, younger customers, mall shoppers and the high-end enthusiasts," Anderson said. "Together, our businesses can help fulfill our vision of making life fun and easy for consumers."

83.    On September 6, 2002 a Dow Jones article titled, "Best Buy to Downsize Sam Goody Mall Stores in Light of Dwindling Music Sales," summarized a presentation made by Best Buy at a September 6, 2002 conference hosted by Goldman Sachs, and (I) confirmed that the Sam Goody stores had been performing poorly for months, (ii) detailed Best Buy's failed strategy for transforming the Sam Goody stores.

-43-

Best Buy Co.'s mall-based Sam Goody stores have been performing worse than expected in recent months, and the company intends to shrink store sizes and close some locations altogether, company executives said Friday.

*    *    *

Thursday evening, Best Buy said it would record a charge of $348 million to lower the value of acquisitions, resulting in a revised loss for its fiscal first quarter. The nation's No. 1 consumer-electronics retailer said the charge reflects a "practical and realistic" appraisal of its Musicland unit, a 1,300- store music and video chain, and Magnolia Hi-Fi, a high-end electronics chain with 16 stores on the West Coast. Sam Goody is part of the Musicland unit.

The long-term outlook for prerecorded music sales is dim. But on the bright side. Mr. Anderson said most of the mall-based Sam Goody stores carry relatively short leases, which average about three years each.

**After Best Buy acquired the mall-based Sam Goody stores last year as part of its Musicland purchase, Best Buy experimented with new product offerings, including DVDs, video games and consumer electronics. While the first two merchandise categories have been successful, the latter category hasn't, Mr. Anderson said.**

84.     On June 16, 2003, Best Buy issued a press release announcing that it had sold Musicland to an affiliate of Sun Capital Partners, Inc. for no cash with Sun Capital assuming Musicland's liabilities.

**Additional *Scienter* Allegations**

85.     As alleged herein, Defendant acted with *scienter* in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Best Buy, their control over, and/or receipt and/or receipt of information of Best Buy's allegedly materially misleading

-44-

misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Best Buy, participated in the fraudulent scheme alleged herein.

　　　　86.　　The Individual Defendants were motivated to commit the fraud alleged herein in order to artificially inflate the price of Best Buy's common stock so that they and other insiders of Best Buy could sell hundreds of thousands of shares of Best Buy common stock worth more than $35 million to the unsuspecting investing public as follows:

| Insider | Date of Sale | Number of Shares | Price per share | Value |
|---|---|---|---|---|
| Mark D. Overgard, Officer | 1/28/02 | 2.500 | $72.660 | $181,650.00 |
| Michael London, Senior VP | 1/11/02 | 30.000 | $73.030 | $30,000.00 |
| Peter A. Bosse, Senior VP | 1/11/02 | 3.750 | $73.270 | $274,762.50 |
| | 2/13/02 | 2.292 | $74.360 | $170,433.12 |
| Total | | 6,042 | | $445,195.62 |
| Elliot S. Kaplan, Secretary | 1/29/02 | 20.000 | $72.480 | $1,449,600.00 |
| | 4/25/02 | 20.000 | $75.730 | $1,514,600.00 |
| Total | | 40,000 | | $2,964,200.00 |
| Michael W. Marolt, Officer | 1/15/02 | 4.191 | $73.110 | $306,404.01 |
| | 5/1/2002 - 5/23/02 | 10.475 | $47.660 | $499,238.50 |
| Total | | 14,666 | | $805,642.51 |
| George Z. Lopuch, Officer | 1/11/02 | 15.000 | $73.760 | $1,106,400.00 |
| | 5/23/02 | 22.500 | $47.200 | $1,062,000.00 |
| Total | | 37,500 | | $2,168,400.00 |
| James C. Wetherbe, Director | 1/11/02 | 54,128 | $73.300 | $3,967,582.40 |
| Bradbury H. Anderson, Vice Chairman | 2/1/02 - 2/22/02 | 10,000 | $68.000 | $680,000.00 |
| | 3/1/02 - 3/29/02 | 12,500 | $68.000 | $850,000.00 |
| | 4/5/02 - 4/26/02 | 30,000 | $76.800 | $2,304,000.00 |
| | 5/3/02 - 5/31/02 | 16,250 | $45.900 | $745,875.00 |
| | 6/7/2002 - 6/28/02 | 15,000 | $37.550 | $563,250.00 |
| | 7/5/02 - 7/26/02 | 15,000 | $29.800 | $447,000.00 |
| | 8/2/02 - 8/30/02 | 18,750 | $20.400 | $382,500.00 |

| | Total | | 117,500 | | $5,972,625.00 |
|---|---|---|---|---|---|
| Susan S. Hoff, Senior VP | 2/11/02 | | 11,800 | $70.000 | $826,000.00 |
| Frank D. Trestman, Director | 2/13/02 - 3/8/02 | | 20,000 | $74.500 | $1,490,000.00 |
| Marc D. Gordon, Executive VP | 4/15/02 | | 15,000 | $78.100 | $1,171,500.00 |
| Charles A. Scheiderer, Officer | 4/5/02 | | 13,500 | $77.250 | $1,042,875.00 |
| Kevin P. Freeland, Officer | 4/4/02 - 4/25/02 | | 127,500 | $74.600 | $9,511,500.00 |
| Gary L. Arnold, Officer | 5/20/02 | | 48,750 | 49.610 | $2,418,487.50 |
| David J. Morrish, Officer | 5/24/02 | | 7,700 | $46.750 | $359,975.00 |
| **Grand Total** | | | **546,586** | **$61.03** | **$33,355,633.03** |

## Undisclosed Adverse Information

87.     The market for Best Buy's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Best Buy's common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Best Buy securities relying upon the integrity of the market price of Best Buy's securities and market information relating to Best Buy, and have been damaged thereby.

88.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Best Buy's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

-46-

89.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Best Buy's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Best Buy and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.

90.     Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

**Applicability Of Presumption Of Reliance:
Fraud-On-The-Market Doctrine**

91.     At all relevant times, the market for Best Buy's securities was an efficient market for the following reasons, among others:

(a)     Best Buy's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Best Buy filed periodic public reports with the SEC and the NYSE;

(c)     Best Buy regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public

-47-

disclosures, such as communications with the financial press and other similar reporting services; and

        (d)     Best Buy was followed by several securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

      92.     As a result of the foregoing, the market for Best Buy's securities promptly digested current information regarding Best Buy from all publicly available sources and reflected such information in Best Buy's stock price. Under these circumstances, all purchasers of Best Buy's securities during the Class Period suffered similar injury through their purchase of Best Buy's securities at artificially inflated prices and a presumption of reliance applies.

## No Safe Harbor

      93.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or

-48-

approved by an executive officer of Best Buy who knew that those statements were false when made.

94.    Furthermore, Best Buy's purported risk disclosures made during the Class Period were generic in nature and not specific to the problems then facing Best Buy, as detailed herein. During the Class Period, despite the fast-changing nature of the Company's business, Best Buy did not change its risk disclosures to reflect the true risks facing the Company. Accordingly, Best Buy's risks disclosures did not constitute meaningful cautionary language and none of Defendants' statements issued during the Class Period, to the extent that they may be considered forward-looking, are not protected by the safe harbor.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against All Defendants

95.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

96.    During the Class Period, Best Buy and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Best Buy's securities; (c) enable Best Buy to complete a $350 million convertible debenture offering on favorable terms and Best Buy insiders to sell more than $35 million of their personally-held Best Buy common stock; and (d) cause Plaintiffs and other members of the Class to purchase Best

Buy's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

97.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Best Buy's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

98.    In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

99.    Best Buy and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Best Buy as specified herein.

100.    These Defendants employed devices. schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts. practices, and a course of conduct as alleged herein in an effort to assure investors of Best Buy's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Best Buy and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Best Buy's securities during the Class Period.

101.    The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and directors at the Company during the Class Period; (b) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; and (c) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

102.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Best Buy's operating condition and future business

prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

103.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Best Buy's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Best Buy's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Best Buy securities during the Class Period at artificially high prices and were damaged thereby.

104.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known of the true financial condition and business prospects of Best Buy, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Best Buy securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

105.    By virtue of the foregoing, Defendants have violated Section 10(b) of the

Exchange Act, and Rule 10b-5 promulgated thereunder.

106.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and

the other members of the Class suffered damages in connection with their respective purchases

and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

107.    Plaintiffs repeat and realleges each and every allegation contained above as if fully

set forth herein.

108.    The Individual Defendants acted as a controlling person of Best Buy within the

meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the

Company's operations and/or intimate knowledge of the statements filed by the Company with

the SEC and disseminated to the investing public, the Individual Defendants had the power to

influence and control and did influence and control, directly or indirectly, the decision-making of

the Company, including the content and dissemination of the various statements which Plaintiffs

contend are false and misleading. The Individual Defendants were provided with or had

unlimited access to copies of the Company's reports, press releases, public filings and other

statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements

were issued and had the ability to prevent the issuance of the statements or cause the statements

to be corrected.

109.   In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

110.   As set forth above, Best Buy and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Best Buy's and the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a)   Determining that this action is a proper class action, designating Lead Plaintiffs and as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

(b)   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action. including counsel fees and expert fees; and

(d)   Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demands a trial by jury.

-54-

Dated: August 18, 2004

**HEAD, SEIFERT & VANDER WEIDE**

Vernon J. Vander Weide, No. 112173
Thomas J Seifert, No. 98863
333 South Seventh Street
Suite 1140
Minneapolis, Minnesota 55402
Telephone: 612-339-1601

*Liaison Counsel for Plaintiffs*

**GELLER RUDMAN, PLLC**
Samuel H. Rudman
Russell J. Gunyan
200 Broadhollow Road, Suite 406
Melville, NY 11747
(631) 367-7100

*Lead Counsel for Plaintiffs*

**CAULEY BOWMAN CARNEY &
WILLIAMS LLP**
Gene Cauley
Allen Carney
11001 Executive Center Drive, Suite 200
Little Rock, AR 72211
(501) 312-8500

HEAD,
SEIFERT &
VANDER WEIDE
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
333 SOUTH SEVENTH STREET
SUITE 1140
MINNEAPOLIS, MINNESOTA 55402
TELEPHONE (612) 339-1601 · FACSIMILE (612) 339-3372

VERNON J. VANDER WEIDE
DIRECT DIAL: 612-339-1617, EXT. 21
E-MAIL: VVANDERWEIDE@HSVWLAW.COM

August 18, 2004

Clerk of United States District Court          **BY MESSENGER**
U.S. Courthouse
300 South Fourth Street
Minneapolis, Minnesota 55415

        RE:    In Re: Best Buy Company, Inc. Securities Litigation
               Court File No. 03-6193 ADM/AJB

Dear Sir/Madam:

Enclosed herein for filing please find Consolidated Class Action Complaint.

                         Very truly yours,


                         Vernon J. Vander Weide

VVW:cw
Enclosure
cc:    Sara A. Poulos, Esq.
       Garrett D. Blanchfield, Esq.
       Aaron L. Brody, Esq.
       Marc Topaz, Esq.
       David Rosenfeld, Esq.
       Joseph H. Weiss, Esq.
       Guri Ademi, Esq.
       Leigh R. Lasky, Esq.
       Fred T. Isquith, Esq.
       Charles H. Johnson, Esq.
       Robert I. Harwood, Esq.
       Charles J. Piven, Esq.
       Darren J. Robbins, Esq.
       Kimberly C. Epstein, Esq.
39-47-01
#31615\03947\001\LTR